**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: T.S.L., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: L.L., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1123 WDA 2022 |

Appeal From the Decree Entered September 8, 2022
In the Court of Common Pleas of Jefferson County Orphans' Court at
No(s):  12A-2022 O.C.

BEFORE:   BENDER, P.J.E., KUNSELMAN, J., and COLINS, J.*

MEMORANDUM BY BENDER, P.J.E.:                **FILED: JANUARY 27, 2023**

L.L. (Father) appeals from the September 8, 2022 decree that granted the petition filed by B.S.T. (Mother) seeking the involuntary termination of Father's parental rights to T.S.L. (Child), the parties' minor child.  After review, we affirm.

The trial court summarized the factual findings of this case as follows:

> [Child] was born [in October of 2014,] while Mother and Father were still living as a couple in the state of Illinois.  They moved to Brookville early in 2016, where Father soon found himself facing a DUI charge.  While on probation for that offense, he incurred additional criminal charges that, aggregated with his probation violation, earned him a sentence of 2-4 years in prison. He and Mother permanently separated while he was incarcerated.
>
> Released on January 3, 2020, Father moved to Clarion with his mother.  That arrangement lasted for approximately 2 1/2 months, during which time Mother took [Child] nearly every Friday

_____

* Retired Senior Judge assigned to the Superior Court.

to spend the weekend with his [F]ather and grandmother. It concluded when Father was arrested on new charges in Clarion County. When he was next released on bail in January of the following year [2021], he moved to Strattanville and resumed living with his mother. Again[,] aided by Mother's willingness to provide transportation, he then resumed regular weekend visits with [Child], which he took advantage of for the next six months. In July of 2021, however, he decided to relocate to the state of Iowa and has had no contact with [Child] since.

When he left for Iowa, Father was under the impression based on a tentative conversation with Mother that he would get custody of [Child] for part of the summer and that Mother would drive the boy halfway to Iowa every month or two to spend the weekend. They did not talk about it again. Father texted several times between then and December [of 2021,] asking to speak with [Child], but Mother either ignored [Father] or said [Child] was unable to talk each time.

After months of accepting Mother's silence, Father sent her a Facebook message reminding her about their supposed custody arrangement and again asking to speak with his son. They exchanged a series of messages immediately thereafter, the last in which Mother indicated that she no longer considered Father to be part of the boy's family.

When Mother would not cooperate with *him*, said Father, he enlisted his mother to intervene on his behalf. His mother did not take the witness stand to corroborate that averment, though, and she did not purport to be speaking on behalf of anyone but herself when she texted Mother on March 22, 2022. Furthermore, the [grandmother's] failure to correct Mother when she said that neither of them had reached out since August—with the exception of the messages Father sent in December—indicated that she did not contest that timeline.

Credibility determinations aside, what Father's own testimony established was that texting and Facebook Messenger were the only media he utilized to attempt to maintain a relationship with [Child]. Armed with a mailing address as of December [2021], he did not send a single card, letter, or gift. His excuse was that he did not trust that Mother had given him her actual address. He said he knew that either [Mother's] mother or daughter lived there, though, which means he knew that its

resident had access to [Child] and could have delivered any cards, letters, or gifts he sent.

Father also had access to the court system or could have returned to Pennsylvania at any time to be with his son. Driven by his decision to violate the conditions of his bail and take refuge in the state of Iowa, however, Father did not deem either to be a viable option. He testified that he did not know whether the court would entertain a custody petition while there was a warrant out for his arrest, and it was the fear of being detained on that warrant that kept him from returning of his own volition. Clarion County, he reasoned, was not likely to bring him back from Iowa to be prosecuted for a couple of misdemeanors. He thus felt safe there.

In Father's absence, [S.T.] (Stepfather) has … assumed the parental role abdicated by Father. [Stepfather] and [Child] have a lot of fun together riding dirt bikes, working with their farm animals, and practicing sports. Stepfather is much more than a playmate, though; he also takes his stepson to practices, attends his games, helps him with his homework, and supports him financially. As Mother testified, in fact, they do everything together. Having taken that active approach, Stepfather has earned a place of importance in [Child's] mind. The boy enjoys spending time with Stepfather and looks to him as a father figure. Though he is still "Steve" at home, … [Child] identifies him to other people as "my dad," has begun spontaneously to sign ["T."] as his last name, and wants Stepfather to adopt him and become his full-time father.

[Child] does remember Father but does not ascribe any special significance to him. Father once gave him a wallet he still uses, and he continues to associate the gift with its giver. It is a neutral association, though; the memory does not trigger emotion or prompt him to ask about Father. While he used to talk about their visits during the first half of 2021 and ask when the next would occur, … Father is not someone to whom he seems to give much, if any, thought at this point.

Trial Court Opinion (TCO), 9/8/2022, at 1-3 (footnotes and citations to the record omitted) (emphasis in original).

Following the filing by Mother of the parental termination petition, the court held a hearing on August 30, 2022. Mother and Father both attended the hearing with counsel, and both testified. Child was also represented by counsel and by a guardian *ad litem*. Additionally, the court heard testimony from Stepfather and from Mother's seventeen-year-old daughter, K.N. The court then issued its decree and opinion on September 8, 2022, granting Mother's petition pursuant to 23 Pa.C.S. § 2511(a)(1) and (b).

After the court issued its September 8, 2022 decree terminating Father's parental rights, Father filed a timely appeal and a statement of errors complained of on appeal. In his brief, Father sets out the following issues for our review:

1. Did the trial court abuse its discretion and commit a revers[i]ble error of law when it held that the statutory grounds for involuntary termination of Father's parental rights had been established pursuant to 23 Pa.C.S.[] § 2511(a)(1) by concluding that Father, for a period of at least six (6) months immediately preceding the petition for involuntary termination of parental rights[,] had failed or refused to perform parental duties?

2. Did the trial court abuse its discretion and commit a revers[i]ble error of law when it held that the statutory grounds for involuntary termination of Father's parental rights had been established pursuant to 23 Pa.C.S.[] § 2511(a)(1) by concluding that Mother had not prevented Father from performing … parental duties, for a period of at least six (6) months immediately preceding the filing of the petition for involuntary termination of parental rights?

3. Did the trial court abuse its discretion and commit revers[i]ble error of law when it held that terminating Father's parental rights would best serve the needs of [C]hild?

- 4 -

Father's brief at 6.

> Appellate review of termination of parental rights cases implicate[s] the following principles:
>
> > In cases involving termination of parental rights: "[O]ur standard of review is limited to determining whether the order of the trial court is supported by competent evidence, and whether the trial court gave adequate consideration to the effect of such a decree on the welfare of the child."
>
> *In re I.J.*, 972 A.2d 5, 8 (Pa. Super. 2009) (quoting *In re S.D.T., Jr.*, 934 A.2d 703 (Pa. Super. 2007), *appeal denied*, 597 Pa. 68, 950 A.2d 270 (2008)).
>
> > Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. … We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.
>
> *In re B.L.W.*, 843 A.2d 380, 383 (Pa. Super. 2004) (*en banc*), *appeal denied*, 581 Pa. 668, 863 A.2d 1141 (2004) (internal citations omitted).
>
> > Furthermore, we note that the trial court, as the finder of fact, is the sole determiner of the credibility of witnesses and all conflicts in testimony are to be resolved by [the] finder of fact. The burden of proof is on the party seeking termination to establish by clear and convincing evidence the existence of grounds for doing so.
>
> *In re Adoption of A.C.H.*, 803 A.2d 224, 228 (Pa. Super. 2002) (internal citations and quotation marks omitted).

*In re Z.P.*, 994 A.2d 1108, 1115-16 (Pa. Super. 2010).

We are guided further by the following: Termination of parental rights is governed by Section 2511 of the Adoption Act, which requires a bifurcated analysis.

> Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citing 23 Pa.C.S. § 2511, other citations omitted). The burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009). However, we need only agree with the trial court as to any one subsection of Section 2511(a), as well as Section 2511(b), in order to affirm. *In re B.L.W.*, 843 A.2d at 384.

With regard to Section 2511(b), we direct our analysis to the facts relating to that section. This Court has explained that:

> Subsection 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. In *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005), this Court stated, "Intangibles such as love, comfort, security, and stability are involved in the

inquiry into the needs and welfare of the child." In addition, we instructed that the trial court must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond. *Id.* However, in cases where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists. *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa. Super. 2008). Accordingly, the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case. *Id.* at 763.

*In re Adoption of J.M.*, 991 A.2d 321, 324 (Pa. Super. 2010).

As noted above, the trial court terminated Father's parental rights pursuant to section 2511(a)(1) and (b), which provide:

**(a) General rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

\*\*\*

**(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(1), (b).

- 7 -

In **In re Z.P.**, this Court provided direction relating to what considerations need to be addressed when reviewing a trial court's decision to terminate parental rights under various subsections of 2511(a). Specifically, relating to subsection (a)(1), the **Z.P.** Court stated:

> A court may terminate parental rights under Section 2511(a)(1) where the parent demonstrates a settled purpose to relinquish parental claim to a child **or** fails to perform parental duties for at least the six months prior to the filing of the termination petition. **In re C.S.**, [761 A.2d 1197, 1201 (Pa. Super. 2000) (emphasis in original)]. The court should consider the entire background of the case and not simply:
>
> > mechanically apply the six-month statutory provision. The court must examine the individual circumstances of each case and consider all explanations offered by the parent facing termination of his … parental rights, to determine if the evidence, in light of the totality of the circumstances, clearly warrants the involuntary termination.
>
> **In re B.,N.M.**, 856 A.2d 847, 855 (Pa. Super. 2004), *appeal denied,* 582 Pa. 718, 872 A.2d 1200 (2005) (citing **In re D.J.S.,** 737 A.2d 283 (Pa. Super. 1999)).

**In re Z.P.**, 994 A.2d at 1117.

In regard to Father's first issue, he claims that although Mother asserted that Father had no contact with her or Child from March or April of 2021 through December of 2021, she later admitted that Father and grandmother attempted to contact her and Child during that time. Essentially, Father claims his lack of performing any parental duties at that time should be attributed to Mother's denial of any contact between him and Child. Thus, Father claims that this failure was because of Mother's actions, not his. In particular, Father

points to discussions between him and Mother related to his having periods of partial custody once he relocated to Iowa, which did not occur due to Mother's refusal to permit contact and was contrary to the regular contact Father had had before his move. Therefore, Father argues that he did not fail or refuse to perform parental duties. Rather, when Father did not have regular contact with Child, he asserts it was because of his incarceration or Mother's actions preventing his involvement with Child.

Similarly, in Father's second issue, he argues that the court incorrectly determined that Mother had not impeded his ability to perform parental duties. In support of this position, Father relies on *In re B., N.M.*, wherein this Court stated that "[w]here a non-custodial parent is facing termination of his or her parental rights, the court must consider the non-custodial parent's explanation, if any, for the apparent neglect, including situations in which a custodial parent has deliberately created obstacles and has by devious means erected barriers intended to impede free communication and regular association between the non-custodial parent and his or her child." *Id.* at 855-56. Additionally, Father cited reasons Mother gave for not allowing contact, such as safety concerns, but which appeared to Father as a demand for financial support. Moreover, Father asserts that Mother was fine with contact between Father and Child when Father lived in Pennsylvania, but that she used his move to Iowa to sever all contact.

Father's first two issues both relate to subsection (a)(1) with the thrust of his first argument dealing with the trial court's determination that Father failed or refused to perform his parental duties. The second issue likewise deals with a failure to perform parental duties but is based on the trial court's conclusion that Mother's actions did not prevent Father from performing his parental duties. In its opinion, the trial court provided its response to Father's first two issues, stating:

> Could Mother have made things easier for Father? Could she have commuted halfway to Iowa every month or two so that Father could see [Child] without the fear of being arrested? Sure she could have. As a result of his own choices, though, Father was the out-of-custody parent, which made it his responsibility to pursue a relationship with [Child]. At no time did it become Mother's duty to actively facilitate it, and it was quickly evident after Father moved that she was not going to cooperate with the purported "plan" that would afford him weekend visits even while he was living in Iowa. By his own admission, it was clear from her last Facebook massage in December that Mother no longer deemed him to be part of [Child's] family, at which point it became wholly unreasonable for him not to do more as a father, whether that meant returning to Pennsylvania or petitioning the court from his distant location. Afraid that either would require him to face the consequences of his decision to become a fugitive, he instead chose electronic media as his only manner of seeking contact with [Child] and contented himself with blaming Mother for "keeping [Child] from him." It was he, however, who had artificially limited his options, and nothing but his own self-interest kept him away from his son.
>
> Face-to-face visits and telephone calls were not the exclusive means by which Father could have kept in touch with [Child], either. Mother gave him a mailing address in December, and while he doubted whether he would find her there, he knew it belonged to one of her close relatives, which means he knew it was an avenue by which he could reach out to his son. Depending on when in December the parties' Facebook exchange occurred, that meant Father had between 3 and 4 months before Mother

- 10 -

filed the petition to terminate his parental rights; he had a window of 3-4 months to reach out to [Child] directly while still remaining well outside of Clarion County. He did not.

When Mother stopped making parenting easy for him, Father simply quit trying and allowed someone else—Stepfather— to take his place both physically and emotionally. Perhaps he continues to feel affection for [Child], and perhaps he imagined that visitation would resume when he eventually returned to resolve his criminal charges in Clarion County. Intention without action is insufficient to preserve parental rights, though. As the above-recited precedent makes clear,[1] Father's parental obligation did not end when Mother stopped cooperating with him. It was his duty to act affirmatively even after it became more difficult to maintain a place of importance in his son's life. In failing to do so, he failed to perform parental duties in excess of 6 months prior to when Mother filed this subject petition and thereby made it possible for Mother to sustain her burden of proof under 23 Pa.C.S.[] § 2511(a)(1).

TCO at 4-5.

We agree with the court's determination. Based on its findings and credibility determinations, the court concluded that Father refused or failed to perform his parental duties for a period of at least six months prior to the filing of the petition to terminate his parental rights. Father's entire argument is

---

[1] *In re Adoption of T.M.*, 566 A.2d 1256 (Pa. Super. 1989), is one of the decisions cited by the trial court in its opinion. Specifically, the *T.M.* case states:

Parental duty does not require the impossible, but may encompass that which is difficult and demanding. A parent may not yield to every problem, but must act affirmatively, with good faith interest and effort, to maintain the parent-child relationship to the best of his or her ability, even in difficult circumstances.

*Id.* at 1258 (quoting *In re Burns*, 379 A.2d 535, 641 (Pa. 1977)). *See also In re E.M.*, 908 A.2d 297 (Pa. Super. 1989).

- 11 -

essentially an attack on the trial court's findings and credibility determinations. However, after our thorough review of the record, we determine that the record supports the court's findings, and it did not abuse its discretion in arriving at its conclusion. Therefore, Father is not entitled to relief.

Father's third issue concerns subsection (b), which relates to what would best serve "the developmental, physical and emotional needs and welfare of the child" under the standard of best interests of the child. 23 Pa.C.S. § 2511(b). Father argues that because the trial court does not provide a citation or discussion relating to Section 2511(b) in its opinion, it has not completed the second part of the bifurcated process. Although Father acknowledges that the court references the best interests of the Child, he contends that the court relies on its own conclusion that Child does not want a relationship with Father, which Father claims is not based on any testimony or evidence provided by Child. Additionally, Father again relies on Mother's actions he claims prevented him from interacting with Child or with Father's other children, a fact Father claims was not even mentioned by the court.

Again, Father is attempting to refute the trial court's findings and its conclusion that Mother met her burden of proof. Specifically, the court stated:

> Mother likewise demonstrated that terminating Father's parental rights would be in [Child's] best interests. The boy is happy with the life he has led in Father's absence. In all relevant respects, Stepfather has established and fostered a parent-child relationship with his stepson, who now wants Stepfather to become in reality the father he already deems him to be and for

- 12 -

the two of them to share the last name ["T."]. Conversely, the bond that once existed between Father and [Child], if it still exists at all, has been weakened to the degree that terminating Father's rights will not prove detrimental to the boy. Once eager to share the details of their visits and curious about when they would next see one another, [Child's] references to Father became fewer and fewer until he eventually stopped mentioning him at all. ***See In re. K Z. S.***, 946 A.2d at … 760 … (providing that courts deciding termination petitions must consider whether a natural parental bond exists between child and parent and whether termination would destroy an existing, necessary and beneficial relationship).

Thus[,] satisfied by clear and convincing evidence that Father's conduct warrants termination of his parental rights and [Child's] needs will best be served by that result, the [c]ourt will enter an effectuating decree.

TCO at 5.

Although in its discussion relating to subsection 2511(b) and despite the lack of a citation to that subsection, it is evident that the court was directing its findings and conclusions to that subsection in its opinion, particularly mentioning the weakening of any bond that had previously existed between Father and Child. Thus, we again conclude that the trial court's decision is supported by the record. Moreover, the court did not abuse its discretion in concluding that terminating Father's parental rights would best serve Child's developmental, physical, and emotional needs and welfare.

Accordingly, we conclude that the trial court correctly terminated Father's parental rights to Child and we affirm the September 8, 2022 decree granting Mother's termination petition.

Decree affirmed.

Judgment Entered.

_Joseph D. Seletyn_

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>1/27/2023</u>